This is a case number four twelve zero zero four three It's Swigert vs. Gillespie at all Must be at all for the appellant carl tenny Your miss penny for the upper lead Daryl Parish. It's the penny Please court She indicated your honor I represent the appellants in this case swigerts camps and the cooper shoes the case about drainage law What's known as a civil law rule? the Basic allegations of the complaint are that mr. Swigert one of the plaintiffs appellants Owns property to the west to the east that is of property owned by mr. Gillespie And that natural Topography the natural course of drainage is such that when rain falls on the swigert property it flows generally From the east to the west across mr. Swigert property and on to the Gillespie property Mr.. Gillespie at some point Because he he didn't want that drainage to enter his property sometimes it got his crawl space He built of an earthen berm he brought in some quantity of dirt And built it in a north-south direction kind of like a dam Along the line between his property that is the Gillespie property and the swigert property And he testified that the reason he built that berm was because he was tired of having the water come from the swigert property on to his property and That having constructed the berm it was effective to keep the water from coming on to his property the civil law rule of drainage Which goes back many years, and we cite quite a number of cases in our brief is Such that as I mentioned if water falls on one property and naturally descends to another the dominant owner From from whose property it naturally flows has the right to send it over and on to the Serbian property And the Serbian property owner has no right to obstruct it so The suit by Mr.. Swigert et al was to make mr.. Gillespie move the berm Judge Weber Essentially well let me back up There are a couple of exceptions to the general civil law rule one of those is Known as the good husbandry exception which allows a dominant owner if he Changes the flow of water on to a Serbian owner. He may develop his property for example, or he may Convert it from pasture to row cropping and so doing that may cause There to be more drainage on to the Serbian owner so the Serbian owner may be unhappy that he now has to accept more drainage than he had before and The law is that if the dominant owner is exercising good husbandry in other words if he's making reasonable use of his property And that happens to change the drainage then the Serbian owner has to accept it in our case What Judge Weber did was to make that same analysis from the owner of the Serbian parcels perspective from the Gillespie's perspective Judge Weber determined that in so many words The harm that was caused to the Gillespie property by the water flowing from Swigert property Much was much greater or far exceeded any harm or damage that was caused to the Swigert property Which was farm it's a small piece of farm property just the ponding up of water under the Swigert property and under those circumstances I think in his words balance the hardships or balance the equities or something to that effect and our point is that Pursuant to two principal cases Dessen is the name of the plaintiff and the first one the other one is my lure The court in each of those cases destined by the ways of this fourth district case Said that While there is Precedent for applying a rule of reasonableness which in our view is the same as balancing of equities balancing of hardships That would seem to be just semantics There is that exception to the civil law rule when you're analyzing the conduct of the Dominant owner when he changes the flow of the water, but there is no precedent to make that analysis or that assessment from the perspective of a Serbian owner in other words to say It's okay for the Serbian owner to change the drainage if It it's reasonable if the harm to the Serbian owner That is being Alleviated by the change of drainage is greater than the harm that might be suffered by the dominant judge Weber's a pretty sharp guy Where did he go wrong in your judgment and picking up on all this? Well, I don't know We of course must have been because of that smooth talking devil on the other side of the table I Think I think judge Weber You know it's hard to Even though I'm here being politely critical of it. It's hard not to be sympathetic When you're the trial judge you have two parties, and you feel worse for one than you do the other He didn't feel like swagger. It was really Damaged very much, and he felt like the list be was But the point is there really is no precedent For him having done that and those two cases by lure and desson Seemed to us to be very clear on that subject It has been suggested in The list is brief that that judge Weber made some Factual determination as to the direction of the flow of the water which we disagree with Our position is that the law was incorrectly applied the standard of view of review is no de novo I think the Gillespie's argument will be judge Weber made a factual determination about the flow of water From swagger to Gillespie or not certainly the facts are that over the years there have been many attempts by the parties to stop or Redirect the flow coming from swagger to Gillespie the properties that swagger and Gillespie live on are Lots on which homes have been built in a subdivision and frankly it may not have been very well designed because the folks in that area Including mr. Gillespie have had a lot of problems with water So over the years they have built burn similar item similar things at least two And their their objective has been to channel the water to a ditch in between a couple of those lots and But the reason I mentioned it is I think it's important to in looking at the language that judge Weber Used in his memorandum order or his docket entry. I don't think he ever says that The water does not naturally run from east to west I mean, why would mr. Gillespie build a berm if it didn't and why would that berm have been effective to stop the water if it didn't There was also the testimony of a civil engineer who testified on behalf of the plaintiffs appellants Who testified based on some topographical maps and some some? Elevations and things like that that his crew had Had made his testimony was that water naturally flowed From east to west from Swigert to Gillespie and that the berm obstructed that flow Is there any testimony contrary to that? Not that I am aware of and I'm sure mr. Parrish will want to speak to that you were trial counsel. Yes. Well, I don't remember any of that Okay, the only testimony was that there were efforts to stop the flow Did it come directly east to west did it come? east like South easterly or northwest or vice versa. There was some testimony about a ridgeline. Mr Cochran was the civil engineer. He identified a ridgeline along which the water flowed in slightly different directions But there was never any testimony from a general perspective that it came from the east and went to the west as I mentioned there was a lot of testimony about berms and a ditch and Maybe some referenced pipes or tiles or something of that nature. But our point is those were all efforts to Obstruct to redirect the natural flow and just because These folks or their predecessors in title Made those efforts to obstruct the natural flow doesn't make what mr. Gillespie did lawful those efforts by the other folks were just as Unlawful in terms of not criminal but contrary to the civil law rule as what mr. Gillespie did There was also There were no damages awarded Ultimately the there was a judge Weber made a suggestion that there might be a small damage award in favor of the Swigerts and Ultimately in order to make sure we had all the That we had a final judgment in the appellate court we we stipulated that there would be no award of damages It doesn't mean there can't be irreparable harm We cite blacks law dictionary with its definition of irreparable harm in our brief in addition to that The ball way case field of the OLL W the BOLL W EG Which was relied upon by the trial court? includes this language in that opinion Quote to demonstrate irreparable injury the moving party need not show an injury that is beyond repair or compensation damages, but rather need show only transgressions of a continuing nature That seems to me to be the nature of irreparable harm or lack of an adequate remedy at law That's our point money damages won't do it I Mentioned the ball weight case and I want to address that again that was the case that judge Weber relied on where a reasonableness of use or Balancing of hardships however you might describe that was used Well, he's either testified on your behalf as to the normal flow of water east to west established that Your client had the dominant mistake most notably mr. Gillespie When he testified that before he built the berm water came from Swigert onto his property after he built the berm it did not in addition to that Phil Cochran was our consulting or Civil engineer that is he he testified based on Topographical information and elevations and things that his crew did I believe mr. What he's a Mr.. Cochran, mr. Cochran said that the flow went generally east to west from Swigert property to the Gillespie property and that the berm obstructed that flow The ball weight case on which judge Weber relied is Distinguishable because while it did recognize the application of a reasonableness of use Analysis or the old-fashioned good husbandry exception To the civil law rule it did that in the context of what the dominant property owner was doing In other words it it looked at that case it made an assessment that what the dominant Parcel owner was doing or not doing either was or was not reasonable Which is just the opposite of our case we know there's an exception To the civil law rule if you're the dominant owner, and you are making reasonable use of your property which Changes the flow or increases the flow point is there is no Authority to make that assessment or that analysis in the context of what the servient owner is doing Okay, thank you. Thank you. It's perish I'm here to answer the questions that the court asked mr. Kenny I'm on the theory that a picture is worth a thousand words. I included mr.. Cochran's diagram It's the last page is three and this yellow line That's this bridge line that he describes is the water north of that line or above that line Goes to the north and that's the water that goes through the It's a huge thing The Gillespie property is below the line It's identified as Gillespie And the area we're talking about here is is that on the on the bottom side of the Gillespie lot And it's above the camp lot. This is a ditch that was built more recently now If you turn one page forward in the brief This is going to show you what these actual natural drainage look like before anybody built any burrows this is This is the Walsh's backyard on the right-hand side of exhibit number one the Gillespie backyard Which is this is defending Gillespie? They have the yard over where you sell the grass and what they did many years ago was Take out this fence and actually dig a ditch right through there where that That's the dish that that you see in the diagram has been testified about but these are here to show you the actual natural drainage course historically Mr.. Ritter the farmer who farms all of this back here now Testified that there was a little concrete spillway right about here. It's about the center of the Walsh's backyard That's the course of natural drainage, so what we're talking about here is judge Weber stated in his Opinion it's lots of people have tried different things over time, but what what the plaintiffs are trying to impose here now It's not natural drainage. They haven't addressed the Walsh's problem at all. That's where the natural course goes. They want the water to run Through the through the Gillespie's backyard and what was happened when the what happened is when the Berm was built behind the Walsh's house and analogous berm was built behind the Gillespie's house We believe mr. Somebody somebody took that down the person has a bobcat in the landscape business is mr.. Swigert. We believe mr. Swigert took it down. That's some speculation. That's it was speculated about but he didn't admit to having done it, but mr. Gillespie said he believed mr.. Swigert took down the first berm Because it was on his property so mr.. Gillespie rebuilt a berm which is 100% on his own property and That's also described and there's some pictures back in the evidence But we suggest what's going on here is number first of all let me address the The camp and the coopage claims judge Weber made a decision on the facts. He said that The evidence did not support Their claims this is camp and coopage the evidence did not support their claims that this Berm down here was affecting their property because they're on the other side of the bridge line They're not affected by what happens here their water that comes through their yard comes from east to west yes But it comes from somewhere north of that and it comes through their yard And we suggest why they notice it now is because there were some 50-year rain events that happened just about the same time all This is going on probably precipitated this case and a lot of interest in that community The evidence was that at Mount Zion. I believe in that Lincoln There was a 50-year rain event during this very same period those referred to in our in the facts taking the facts We do not believe this is a de novo case a judge Weber is a good judge, and he did a very good job of analyzing the facts when he got to the he rejected the camp and coopage claims out of hand and when he got to the The claim of the swaggered he was then he started to compare things and he's got Some modified drainage going on He's weighing do I make them take down there do I make the Gillespie's take down their berm and fill their backyard with water and I run into their house or What what's by comparison? What's the damage to the swaggered farm, and they've stipulated. There's no damage and As mr. Kenny said maybe maybe that's not exactly the test as to what's irreparable harm, but it's awfully close to it It's certainly persuasive evidence to show what about the Doctrine of law if you're this observant to state that you can take action to block the normal water flow well You can't block the normal water flow, but this isn't even normal this isn't close to the normal water flow This is some artificial water flow that's been imposed by something that somebody else did in the past This is not a case to reinstate natural water flow in that case you'd sue mr. Walsh and make him take the berm down behind his house because his house is where the natural water runs through this and that's why I referred to the case that that Approves of the restatement it doesn't actually adopt the restatement as the law of Illinois But it approved the rule stated in that case and I'm referring now to the going case 2009 case in the first district which cited with approval the restatement section the restatement third of property section 4.8 And that is a case in which that rule says that the subservient landowner can do some things to modify the easement on his property and To the you can do it to the extent that it helps this property and doesn't hurt that the above property It's not Illinois law though is it well No, not yet. It ought to but everyone so we'd have to overrule this and I don't think so Every one of these cases this civil law rule is something that happened that was adopted Probably hundreds of years ago someplace. I think it's I think it's served this well until the summer of 2012 No, the Templeton case is the first the Supreme Court of Illinois that we've been chewing away at it for 30 or 40 years The Templeton case was decided I think early in my law practice But it's not you know it's been around 40 years or 30 years and each one of these cases They talk about these issues and the resatement is a perfect statement of the rule It's actually been worked on over the time and what whether you're the subservient person you want to change the easement to Move it basically that the the case that was that that was referred to was a lady moved a driveway That was on her property for the benefit of the other folks it didn't hurt the dominant owners at all It helped her a lot to move it and what what has happened here is the parties years ago They dug this ditch which didn't exist before to make a place for the water to go between their houses So it wouldn't go like right up to and through their house and the testimony of Mr. Cochran is that that ditch actually has enough capacity to carry water as fast as this 270 acres can produce it he calculated the runoff in terms of cubic feet per second I think it's like almost a hundred cubic feet per second In a big rain, that's how much water will run off this whole farm That ditch has within a couple of cubic feet per second at all the capacity What does that ditch have to do with the berm that was built between they used the dirt from the ditch They did at the same time they used the dirt that they dug out of the ditch to create these berms. Well if you wanted to use the ditch Go ahead and build use the ditch. It's on his own property. What's an issue here is the berm? Yeah, so take the dirt, put it somewhere else. Don't create a berm. You talk about the ditch as if you know These were inextricably linked. They're not If there's a ditch you want to build on your own property, I don't see the plaintiff stopping them The question is the berm. The plaintiff's testimony is the plaintiff actually agreed to all this. When this happened 15 years ago the owner of that property acquiesced in it. They said okay build the berms and build the ditch and that's fine We'll do it that way and then at some point the new owner Mr. Swigert takes down the berm because it's I don't know it's on his property. I don't think it was a drainage question It's on his property. That was the issue He wanted to move his cornfield over a route or something. So then the new berm gets built on the Swigert property back on into their property And it is they are kind of related because the new ditch replaces the old waterway through the Walsh's backyard The berm behind the Walsh house gets the water over to the ditch and the thing is the water actually goes you know without the Corresponding berm behind the Gillespie house. It goes but instead of instead of coming down this way through the Walsh's yard Let's say okay. So here's here's Walsh's yard and here's Gillespie's yard. Instead of the water coming through here like this There's a berm here so the water comes around the berm and Instead of coming just down the ditch now with no berm it comes basically through the Gillespie's yard and the ditch That's what's being complained about and our thinking is if you if you really want the natural drainage Okay, that's okay, but come over here and talk to these people about it. Don't talk to us Natural drainage isn't going to come through our yard as you see in these pictures The top picture here, this is the natural drainage. This over here is the Gillespie's backyard. There's no water in that yard It's all over here coming through the neighbor's yard So What about Mr. Tenney's argument regarding the Bowleg case And the fact that It's the that that that decision applied to a dominant estate and the same rule wouldn't apply to the Serbian estate I Don't know that that distinct is really important That's that's the way that that was the facts of that case, but I don't think the facts have to be limited to that As long as if the person downstream wants to do something that does not affect the person upstream That's something that's important a lot Well it did affect them your argument is it's minimally damaging to them Because they were taking on more water than they did under the previous Way things were Swigerts were taken on previously Swigerts had less water Problems, I would take all the water all the water comes through the Swigerts farm. 270 acres worth of water comes right through the Swigerts farm. But I thought it was pooling on Swigerts land after this berm was put up. It might pool for a few minutes or a couple of hours. It's like when we talk about a farm, you know three three days worth of water standing on your crops will injure it less than three days. It's okay. You know that the tile systems or grain are designed to get rid of all the surface water in three days. There's no testimony that water stood on the Swigerts farm for more than a couple of three hours. There's no testimony that they had any water standing on their farm for long enough to cause any damage. And They stipulated they didn't have any damage. Well for purposes of taking the appeal and getting a final judgment. Well, I don't know if that's the purpose or not. The judge decided there wasn't there wasn't there was almost no damage and he made a Suggestion. That's why there are two appeals in this case because the first judgment wasn't final. Judge Weber made his ruling and then he made this suggestion which wasn't a final judgment and it wasn't over with. But I don't know that you can attribute it. You know if I stipulate to something because it gets me a final judgment does that make the stipulation any less factual or less binding? I don't think so. Was there any case that's applied the Bolvik decision to a Serbian estate? Well, I don't I don't think in a drainage context, but I but I think the the McGoy case talks about what the Serbian person can do to change things. I think that's What what does it say the Serbian person can do? The Serbian person can make a change in the easement to the extent it doesn't cause any harm to the upper easement period. They can do that. The rule the restatement rule says unless expressly denied by the terms of the easement the owner of a Serbian estate is entitled to make reasonable changes in the location or dimensions of the easement at the Serbian owner's expense to permit normal use or development of the Serbian estate, but only if the changes do not significantly lessen the utility of the easement, increase the burdens of the owner of the easement, or frustrate the purpose for which it was created. It's not a water case though, is it? The the restatement doesn't limit itself to water. No, but the case you're citing isn't a water case. It's a driveway case, yeah. Dustin's a water case. The case is cited by Mr. Tenner, water cases. It says the Serbian estate can't interfere with the flow of water. They don't balance the equities. Then you get to the factual question, would, had we really, are we talking about the natural flow? And Judge Weber, I think, discussed that pretty completely. He said there's not natural here. Everybody's tried a lot of things over a long period of time, and he didn't see what was trying to be imposed was the natural flow of water. Is there more water on the diamond in the state after the berm than there was before? No. It might be there for a few minutes longer, but the total amount of water, it doesn't dam it up. This ditch that they dug, it just collects all the water and takes it away. You know, in a timely enough fashion, it doesn't cause any damage to the crops. You know, we're prepared to damage, potential damage to farmland and crops. So an element of, is you have, the water's got to be there long enough to damage, if you're interfering with the flow. If we're talking about farmland, yes. Where did that come from? Is that in the Dessin case? That's why we see all these retention bays. Every Walmart parking lot's got a pond beside it, okay? And that's so that the water will stand there long enough so that it doesn't cause harm downstream. And that's what's kind of going on here, is the water is being taken away as fast as it needs to be. There is no harm. Where is the element of damages in the notion about how the dominant estate can't have the interference? It has to do with irreparable harm. That's the notion. When you try to enjoin something, there has to be some harm to the person who's trying to get the injunction, and they haven't actually shown any irreparable harm. I don't have anything further. Thank you, Counselor. Thank you. Mr. Tenney, be rebuttal. What about this harm element, Mr. Tenney? Well, we cited the definition of irreparable harm in our reply brief from Black's Law Dictionary. A few minutes ago, I quoted the language from the Baldwin case. You know, it's like win-win-tails-we-lose by this argument. If we say we don't have money damages, that means we're not harmed. That's the whole concept of irreparable harm. You can't fix it with dollars. It's not something you can put a dollar amount on. So what's the evidence concerning the additional water on your client's property? The evidence was, I'm thinking of two or three photographs, which I did not make copies of for my brief. They're in the record. There were photographs that Mr. Swigert took. They were taken from the east looking west. In the background of the picture is the berm. In the foreground is a relatively large accumulation of water that the berm was stopping or holding back, ponding up onto the Swigert property. Mr. Swigert testified that he never had that until that berm was built. And I, you know, there's been a lot of discussion about which way did the water flow and what was natural and what was not. Why in the world would Mr. Glispie built the berm to stop the water from coming from Swigert to his place if it was not flowing naturally in that direction? Having built the berm, it was effective. And I appreciate Judge Weber's comments, but when he says that residents of, residents, that is, of Peggy D Drive, that's the street these people live on, quote, to channel the flow from sheet drainage off the Swigert property to a single point, which I think he was referring to the ditch. I mean, the fact that gives rise to his making that comment is that there was sheet drainage off of the Swigert property onto the other end. What kind of drainage? Sheet. Sheet. I think that's the technical term. It rains and then it flows, something in a sheet of water. So the court didn't find that there was a change in the natural flow. He just found that the people in that vicinity, the people in that subdivision were trying to obstruct the water, divert it, re-divert it somewhere else. But the point is it came from Swigert. It went to Glispie. The photographs, excuse me, in the record reflect that the berm was, one of its effects was to cause water to pond or stand on the Swigert property. We will say again in so many words that we think the distinction between being dominant and servient in terms of whether you're allowed this reasonableness of use rule is very significant. I'm not aware of any cases where a servient owner was allowed to do that. To the contrary is Dessin and Mylure. We continue to rely on those cases. Okay. Thank you, counsel. Thank you, Senator Meder.